Continental Airlines v. Department of Labor, and we'll hear first from Mr. Meindertsma. Meindertsma, correct. Good morning, and may it please the Court. My name is Don Meindertsma, and I represent Continental Airlines, the petitioner in this appeal. Attending the argument today with me is Captain Andy Jost, seated to your far left in the front row. As you know from the briefings, the Department of Labor's administrative review board held that Captain Jost punished Captain Lutter because Mr. Lutter supposedly reported a violation of aviation safety regulations. Continental Airlines strongly disagrees with that finding, disagrees with the analysis that the Department of Labor used, disagrees with the way the Department of Labor applied the law, and disagrees with the findings of fact as being supported by substantial evidence. Continental's primary objective today is to protect and preserve a procedure that the company uses and has long used, and that many entities and safety-related businesses use to protect safety and run efficiently and reliably. That procedure requires coordination, communication, and open-mindedness. Continental, as an airline, has multiple departments that support flight operations. Those departments are staffed with experts in their fields. They are staffed with experts in maintenance, in coordination, in flight operations, in flight efficiency. Continental has to consistently apply that procedure to make sure that flight operations remain safe and efficient. What Captain Lutter did in this case was to not follow that policy. The policy is pretty simple. If a pilot has a question, if an anomaly arises during flight operations, the pilot is supposed to contact the coordination center. As the name implies, that center is there to coordinate. Is the pilot, the captain on the airplane, in charge of safety for that airplane? The regulations say that the captain is the final arbiter of safety. The procedures and policies say, well, they say that as well. They also say that pilots are expected consistently to use sound judgment in their decision-making. What happened here is that Captain Lutter had a gut instinct. The gut instinct may have been reasonable. He heard some things about prior turbulence. He needed to coordinate. The only way that Continental can consistently run its operations safely and effectively is if people talk out issues that arise. In each case, if that policy is consistently applied, the best decision will be made. I don't think there's any question here that Captain Lutter did not comply with those responsibilities. First of all, when he had a— All of this is in the record, I guess, huh? Pardon me? All of what you're telling us about the internal operation procedures and people's responsibilities, this is in the record? Yes, particularly the flight operations manual covers these things. When the pilot disagrees with somebody else's decision on how safe it is to take off the airplane, doesn't the fact that he's final orbiter give him the final word? Let me put it this way. He wanted the final word to be his gut instinct. Say that again? He wanted the final word to be what his gut instinct was. It was fine for him to have a gut instinct. Well, you call it gut instinct. I mean, who knows whether somebody's decision is a gut instinct or been thought out? Well, the record says he immediately concluded. Immediately concluded. So that is a gut instinct. Well, you and I might think that, but, I mean, are we entitled to overrule the guy whose word is the final orbiter by calling it gut instinct? I mean, you could say that about any decision, couldn't you? No, let me try to clarify. His initial reaction was, oh, sounds like severe turbulence. Then he took what we would say is the easy way out. He said, okay, let's just do an inspection. He didn't try to coordinate an inspection. I believe it was quite as flippant as you're making it, Counsel. He was told by a pilot from the preceding flight the turbulence was so rough it almost tore the wings off. Now, maybe that's hyperbole. And about the radar going into pink or something about indicating severe turbulence. So I just think you're putting a gloss on it that is not a fair representation of the record. I don't intend to suggest, and I apologize if I did, that I was being flippant about this. There is a chronology. There is a timeline as to what had happened, and I'm simply repeating the facts, that he had this immediate reaction. The procedure then calls for discussion. He is the ultimate arbiter of safety, and if after the discussion he still felt the right thing to do was to have an inspection, he would have had an inspection. The inspection would have been done and nothing would have happened. We wouldn't even be here today. So the final, all he was being admonished for in the warning letter was you need to participate in our process. That process is critical. And if the Department of Labor's decision in this case stands, Continental management, and again, these are pilots too. They understand turbulence. They understand safety. They're not flippant about safety. If the Department of Labor's decision stands, how could Continental have addressed what they thought, truly believed, not just thought, truly believed was an improper set of actions by Captain Lugar? They couldn't have said boo to him because that would have been discrimination. What did Continental have to add to the discussion about whether the airplane encountered severe turbulence? What additional fact would they have put in the mix that wasn't already there? Well, they, again, it's coordination. You can contact other pilots who were involved, which they did. They could have identified, you know, the circumstances more clearly to Captain Lugar. Again, he was, again, not being flippant. But again, what additional facts did they have to add to help Captain Lugar make a final decision? That there was no severe turbulence. Well, what facts, though, would indicate that? Captain LeMaire was the pilot in command and the final arbiter of safety on the flight from McAllen to Houston. If, in his judgment, and he is not only an experienced pilot but an airframe and powerplant mechanic who knows the airplane quite well, if in his judgment, again, the final arbiter, there was severe turbulence, he would write it up in Houston when he got there. No reason for him not to write it up. He had plenty of time to have an inspection there. He was taking the flight himself, Captain LeMaire, from Houston to Miami, getting on that plane and flying it. His judgment, which Captain Nelson has every reason to respect, was that there was no severe turbulence. Lugar already knew that, didn't he? Lugar already knew that. He knew it hadn't been written up. He knew the captain obviously didn't. They had a disagreement between the two captains about whether it was severe turbulence, and Lugar knew that the previous captain didn't think it was. I mean, so what was new about that information? Lugar assumed there had been severe turbulence. Nobody except him used that term. Nobody said there was severe turbulence. He assumed it. Nobody said there was pink turbulence? They said there was pink. Severe turbulence, and again, we fly on planes. To us, turbulence is, even a jolt is discomforting. To pilots, there may be more concern about whether they're used to turbulence. They know the plane is engineered very regularly to withstand these forces. And all of this was presented at the administrative hearing? Yes. Pilots know that they know this, that, and the other? This is all in the record, as you've already said to Judge Dennis. I'm not sure about the engineering part of it.  I apologize, sir. You know, we have a procedure, just like you're saying Continental did, and this went through an administrative hearing with an ALJ. It goes to the ARB. It goes back to the ALJ. It goes back to the ARB. And that's where all of this should have been developed. Well, it was developed that Captain LeMaire was experienced and understood how aircrafts work and decided he made the judgment, which, again, Continental Management was entitled to respect, that there was no severe turbulence and no inspection was needed. Was Captain Luder entitled under the operations manual to disagree with the previous pilot? I mean, was he entitled to do that? In the end, he was, as I said before. If, at the end of reasonable coordination and discussion,  an inspection would have been completed and, again, we wouldn't be here today. The problem—go ahead. No, you go ahead, sir. The problem is he truncated the process, and the management's response to that was very reasonable. It said that. You used poor judgment. You did not—I mean, he hung up on the assistant chief pilot. After discussion? After the discussion had started. The procedure manual says Luder was supposed to contact the Systems Operation Coordination Center. He didn't do that. They called him, and they started talking to him, and he hung up. They called him back, and his first officer, First Officer Wofford, testified that Luder's conduct on the phone to the assistant chief pilot was absolutely disrespectful. Again, if the Department of Labor prevails in this case, management could have done nothing at all to tell Captain Luder, next time you could do this better. That's what we're trying to protect here is the process that the company has in place, and that process, if reliably and consistently applied, will reach the best results. Again, Captain Luder, in the end, I know it's of concern to the court that he is the final arbiter of safety, and I'm not saying he isn't, but he also had the responsibility to cooperate in the process in the flight operations manual, which is approved by the FAA, to reach the best decisions, and he didn't do that, and that's all he was admonished for. As you know from the briefing, we also contend there was no protected activity. It was more than an admonishment, wasn't it? It was a warning letter, a warning letter of misconduct. And what else? Well, because he didn't show up for the meeting the first time, they removed him from the flight schedule so that he would attend the meeting. It's in the records, clear, that management felt that Captain Luder was blowing them off. Mr. Commodore, the assistant chief in Houston, at the end of their conversation with Captain Luder on the day, September 15, said, you need to come in, we need to talk. Captain Luder said, no, I'm going on vacation. They sent him a letter, knowing he was on vacation, saying, come in October 4. Early morning hours, he says, no, I'm on vacation, which wasn't true. He was not on vacation. And he wrote a long email saying, you know, basically I did the right thing. So they looked at the schedule, saw he had a flight coming up, took him off the schedule, and then had him come in instead of going on a flight, October 11. And he did that. The fact finder in the case, the administrative law judge, held, as a matter of fact, that the reason he was removed from the schedule and lost the $3,000 of pay associated with it was because he did not attend the meeting. That is a finding of fact which the administrative review board did not even mention. The administrative review board had to sustain that finding of fact because it was supported by substantial evidence. Mr. Court, last ---- You're talking about the suspension? Yes, right. And was there a written reason for that is for not attending the meeting? Yes. I don't think there was any question that it was for not attending the meeting. As I said, the judge found that in the warning letter. It was stated that the looter would not be allowed to make up the flight. He can always bid for more flights, but would not be paid for that period of time because he did not attend the meeting. So that's in the record. And that's ---- He said at some ---- Captain Looter said at some point, well, I only got last minute notice of this meeting, that's why I didn't show up. That's not what he said in the e-mail that he wrote that morning, October 4. He didn't say anything about it. I just found out about this. So the evidence shows he was not being candid about why he wasn't coming to the meeting either. Let me address briefly protected activity. This court last year in a Sarbanes-Oxley case, Villanueva v. Department of Labor, said the critical focus for protected activity is on whether the employee reported conduct that he reasonably believes constitutes a violation of law. So the first thing we need to look at is whether there was a violation or reasonably believed to be a violation of federal law. The ARB's ruling or holding on protected activity is this. Captain Looter had a reasonable belief, objectively and subjectively, that the reported turbulation required him to take the actions that he did. There's nothing in there. That is not the law. That is not how the law works. There's nothing about a violation. There never was a violation. Again, there can be no reasonable suspicion that Captain Lemaire criminally decided not to do an inspection after severe turbulence and then put his life in peril by getting on and flying the same plane. There can be no reasonable belief that there was a violation of anything. There never was a violation of anything. That's clear. The plane was always safe at all times. Well, but he didn't believe it was safe. And Continental, well, didn't the ALJ find that one of the reasons Continental took action against the pilot was because he refused to take the plane up? The administrative law judge said that Captain Looter reasonably believed and wrote in the maintenance log that Captain Lemaire flew through severe turbulence, thereby grounding the flight for inspection. That's what the administrative law judge said. He didn't say anything about a violation either. The whole controversy, I thought, was over Continental wanting him to take the airplane up on the flight and not delay the flight, and he didn't think it was safe. Wasn't that what the controversy was about? No. Captain Looter has tried to drive safety as a wedge into this issue in the administrative report. Did Continental not want him to take the plane up? Wasn't that what they were lobbying for? Continental, as I said, in every case where there's an anomaly, has a process in place. We want to talk and reach the best decision. In this case, the best decision may not have been to do an inspection. There was no severe turbulence. The plane was safe. That's really not what I asked you. Wasn't Continental lobbying him to take the plane up, telling him that it would be safe to take the plane up? They were giving him what information they had, that there had been no severe turbulence and there was no need for an inspection. So there's a disagreement between Continental and Looter about whether it was safe to take the plane up. I mean, isn't that what the controversy was about? It wasn't a controversy at that point. It was a coordination attempt. They needed to talk to each other, and that's all they told Captain Looter. He did wrong. Thank you, sir. Okay, Mr. Philbin. Good morning. May it please the Court, my name is Quinn Philbin. I'm representing the Department of Labor today. I'd like to start with a brief opening. A pilot's fundamental charge is to ensure the safety of passengers and personnel. Continental's field operations manual recognizes this charge as its, quote, paramount concern and places final responsibility for an aircraft's safety on the pilot. In passing the Air 21 statute, Congress determined that protecting pilots and other employees that report airline safety issues from employer retaliation would facilitate airline safety. Here, intervener Captain Looter provided information to Continental related to an alleged violation of an FAA safety regulation, and in response, Continental deprived him of pay and threatened to deprive him of his job. What do you say to counsel's argument that the real reason for the suspension was he missed the meeting and wouldn't engage in conversation with the chief pilot and the assistant chief pilot about whether it was safe or not? That was the real problem Continental had with Looter. Well, with respect to not attending the meeting, as counsel for Continental acknowledged, there were two different letters. There's an October 4th letter and an October 19th letter. The October 4th letter had placed Mr. Looter on a temporary leave. In the subsequent letter, after the actual meeting with Mr. Looter, they specifically referred to an unpaid disciplinary suspension. After they had done their full investigation, they said that in calling for the inspection, and that's a quote from the letter, we're placing you on an unpaid disciplinary suspension for calling for the inspection. Calling for the inspection was the protected activity. In three different ways, Mr. Looter had provided information that related to an alleged violation. You're saying the letter for calling for an inspection without consulting, without going through the required process to consult with the Continental representatives? No, I would say that Captain Looter did engage in that consultation. No, no, but what did the letter say about that? Well, the letter had said that Mr. Looter, I'm sorry, Captain Looter, was insubordinate in calling for the inspection. What I would say with respect to Continental's assertion that the only reason that they disciplined Mr. Looter was for insubordination is that I guess there's a few things. First, it's Continental's burden to disentangle the alleged insubordination from the protected activity because they're exactly the same here. What they're saying was insubordinate was what Mr. Looter did in calling for the inspection. And what he did was he actually called a dispatcher, was connected to a maintenance controller, and spoke with both of them about what had been communicated to him and expressed his reasonable belief that the plane had undergone severe turbulence in the leg from McAllen to Houston and that it had a mechanical inspection before the leg from Houston to Miami. In making those communications, he was engaging in protected activity. He then conducted two different phone calls with Kip Comador, the assistant chief pilot for Continental, on which at least the first, and I believe both, were the SOCC operations director, Mr. Gubitosa, and Mr. Sunbury, who worked in maintenance control, and conveyed the same information to them. With respect, Continental's counsel mentioned that he had hung up the phone on the first call. As we had mentioned in our brief, Continental's own guide communicates to pilots that they're not supposed to discuss safety issues in the presence of customers. That first call was being conducted at the gate, and there were customers right there, so it would be reasonable for Captain Looter to think I shouldn't be discussing the safety issue in their presence. Did he testify to that effect? He testified to the effect that he was concerned that he would get in trouble if he continued on the call. No way. Did he say, I didn't want to be on the call because customers were around? Did he testify to that effect? He didn't explicitly testify. I wish people would stay within the record. We're making stuff up out of whole cloth here.  So he conducts the second call with Mr. Comidor. As you all know, there were significant hearings. There were five different days of hearings. Everybody who was involved in these conversations was able to testify. The ALJ gave significant credit to the testimony of Captain Looter. He concluded in his discussion on clear and convincing evidence that Continental had him produce credible testimony to rebut Captain Looter's case, which means that he didn't find the testimony that was provided by Captain Comidor and Captain Yost to be compelling and to overrule Captain Looter's testimony. And he specifically found that the testimony of Wofford, who was Captain Looter's first officer, was not credible with respect to the alleged insubordination on the second call when Mr. Wofford was in the presence of Mr. Looter as he was conducting the call. Let me ask you this now. The first element in establishing that Looter engaged in protected activity depends on the employee providing information to the employer about an alleged violation of federal law. Could you articulate to me how Looter provided information to Continental about an alleged violation of federal law? Yes, I can try to remind you. So 14 CFR 91.9, which is an FAA regulation, states that a pilot must comply with the operating limitations of the applicable field operations manual. Continental's field operations manual states that if a pilot believes that a plane has flown through severe turbulence, a mechanical inspection must be conducted before the flight is taken off the ground. Captain Looter had received information through his first officer that the first officer on the previous flight had said that the plane had flown through pink and had the wings ripped off, as we had discussed earlier. As we had briefed, the radar that has the colors which indicate severe turbulence goes from green to yellow to red to magenta. Captain Looter's understanding of the reference to pink and to have the wings having been ripped off was that— Strong enough to rip the wings off. It didn't rip the wings off. I'm sorry, Your Honor. Yes, strong enough to rip the wings off, was that the plane had undergone severe turbulence. And so he then communicated to Continental repeatedly in at least four different phone calls that information and his reasonable belief that the plane had gone through severe turbulence and that it was necessary to do the mechanical inspection. So it's our position that in communicating that information, Captain Looter had engaged in protected activity. Well, he didn't report a violation, though, did he? What's the violation? An alleged violation. So I guess two answers. First, he was reporting—so there were two flights of the plane before the flight that he was scheduled to fly. It was in the first flight of those two that the turbulence that's at issue here was incurred. So he was—and after that first flight, the plane was taken up. So he was reporting his reasonable belief that there already had been a violation based on the flight from Houston to Miami without having done a mechanical inspection before then. But he was also reporting to them that there would be at least another violation if the flight from Miami back to Houston was taken without a mechanical inspection. So the violation hadn't actually occurred yet, but he was communicating his reasonable violation that it would occur if he took the flight up. On that first flight, there would only be a violation if the pilot in command thought it was severe turbulence that warranted an inspection, wouldn't it? Not necessarily, because a flight could incur severe turbulence, and I guess for different reasons a pilot might think it hadn't. But if after the fact it was found that it had incurred severe turbulence, the Continental's policy would have required that plane to have undergone a mechanical inspection. There was some discussion of the warning letter that had gone out, and Counsel for Continental had mentioned that there was an ALJ finding of fact that Continental had issued the warning letter solely related to not attending the first meeting. I guess a few points on that. First, the substantial evidence in the record supports the fact that Captain Lutter wasn't even in his home state when he found out about the letter from Continental. Continental had sent a notice on September 24th that said we want to have this meeting on October 4th. Continental knew he was on vacation until October 1st. It so happened that he had days off, which is an industry term. Pilots sometimes have days off where they're just not scheduled to fly. So he remained in the place that he was for his vacation, which was Arizona, and didn't find out about the letter until October 3rd. So I guess that's the first point he made. The second point I'd make is that the appearance of the fact finding, which was alleged by Continental, occurs on page 39 of the ALJ's original decision in his finding that Continental's assertion that Lutter's engagement in subordination was the reason for the discipline in the ALJ's finding that that was pretext. It didn't occur in a finding at the beginning of his discussion. What he was saying is Continental represents that the reason they disciplined Lutter was insubordination, but I find that to be pretext, which I think is a little different than had been presented to the court earlier. Also, just to clear up, or I guess to clarify, the ARB's current position on warning letters of this effect, a warning letter that threatens further discipline if there's any further activity, is clear. In the Williams decision, which we had briefed, the board looked to Burlington, the Supreme Court decision on point here, which states that any action, any action that would dissuade a reasonable worker from engaging in protected activity constitutes adverse action, and concluded that a warning letter of this type, one that says you've had unsatisfactory performance issues and we're disciplining you and may provide further discipline for further unsatisfactory performance, the ARB specifically found that that is adverse action, and has held that consistently in the five years since the Williams decision. With respect to Continental's clear and convincing evidence burden, a few things. I think first it's good to remember that the Supreme Court's been pretty clear that that, I'm sorry, circuit courts have been pretty clear that that burden is to show that it's highly probable that a company would have disciplined this person absent the protected activity. There's evidence in the record from both expert witness Watley and from Ed Gubitosa, who is Continental's systems operation control chief, that heated discussions between pilots and dispatch are commonplace. Yet Continental, which is a very large airline and flies many flights as we know, didn't produce evidence showing that it has disciplined other pilots in these type of situations. I would expect, given the evidence in the record from Continental's own witness, that these type of heated discussions are commonplace, that there would be such evidence, but there is not. So there's no comparator evidence which suggests that they were imposing discipline on Luder, not for alleged insubordination, but for his engagement in protected activity. Does Emanuel require a pilot before he delays a flight for a scheduled inspection to confer with the chief pilot or his representative? It requires him to confer with dispatch within SOCC. And what Captain Luder did was he called dispatch, a gentleman named Bass, I believe, who then connected him with a gentleman named McClure, who was in maintenance control. I would admit that Captain Luder himself did not contact SOCC, but shortly after he had spoken with McClure, SOCC, in the form of, I guess it would be Sunbury, in conjunction with Commodore, called Captain Luder, and he conducted conversations with them about his reasonable belief that this plane had incurred severe turbulence. Counsel for Continental talked at length about the need to coordinate. As I said before, there were four different phone calls. It's not as if Captain Luder called for the inspection to one person and then refused to engage in any further conversation on the issue. He communicated to at least five different people within Continental structure his reasonable belief that this plane had undergone severe turbulence and therefore needed a mechanical inspection. I'm not sure what else he could have done to engage in further coordination. He could have listened to his chief pilot or assistant chief pilot when he was on the phone with him. You don't ordinarily just hang up on your boss. Yeah, I think he could have conducted himself a bit better with respect to the call that he was taking on the bridge. He could have, assuming he was concerned about the customer's presence, he could have said, I need to take this call elsewhere. I'd like to go back into the cockpit. That may have been a more ideal way to handle that situation. But as the evidence in the record suggests, these type of heated discussions are commonplace. It's a very pressure-packed environment. He wants to get the plane out on time, too. He's not trying to subvert Continental's interests, and he knows that all the time that he spends in these type of conversations is his. Did Captain Lutter say that during these calls he felt that he was being told not to follow through with this complaint and to get on the plane and take off? He did. In fact, before the conversations, he had received information. He had communicated not to board the flight to the folks who would normally board the flight. And in the interim, before he even had the conversations with Assistant Chief Pilot Comedor, he had been instructed that they were going to board the flight, which was already an indicator that the inspection wasn't going to be conducted. And then secondly, the evidence in the record, the ALJ determined that Comedor was actually pressuring him to fly the plane without an inspection and concluded, therefore, that Captain Lutter was justified in telling Comedor that if he did pressure him and compel him to fly the plane without an inspection, he would report him to the FAA. So, yes, the evidence in the record supports the fact that Continental was trying to pressure Captain Lutter to fly the plane without first conducting an inspection. Okay, your time's up. Okay, thank you, Your Honor. All right, Mr. Domich. Good morning. My name's Howard Domich. I'm the intervener's attorney, and I've tried the case. I'm going to just try to talk about some of the questions that the Court's had because I may be able to clarify a few things. Before you do that, this assertion is made that the relief Lutter seeks in this proceeding of more compensation, that because he didn't file some sort of cross-appeal or something, he can't raise that. So give us a quick response to that. We briefed that in our brief, Your Honor, and we're relying on the Supreme Court case U.S. v. I believe it's American Railway Express. It's an old case and some subsequent cases that are its progeny, which the issue was raised below in the record below, and therefore we believe we preserve the issue here. And I believe that's around page, I want to say about in the 45 range of our brief. We discuss it. Ordinarily, you have to cross-appeal if you want additional relief, though, don't you? Well, we're not asking for additional relief. The only thing that we raised on that point was we thought that the ARB, because of the way they worded their second opinion where they stated that Captain Lutter stopped seeing his doctors in September of 2011, and then they talked about the tachycardia in the next sentence in their opinion. All we point out is that Captain Lutter, in fact, was still seeing his doctors. In fact, when Mr. Marzen took his deposition out in California, he testified in his deposition that he had a doctor's appointment with his cardiologist two weeks later. And about, I don't know, two months later, whenever we did the briefing on that, we supplemented the record with the halter monitor report that was taken after his deposition that showed he still had tachycardia. But aren't you saying the ARB didn't give you adequate compensation? Didn't you have Captain Lutter? What I'm saying is that I think the ARB missed that one key fact, that Captain Lutter was, in fact, still seeing his doctors past September of 2011. So while we're asking this Court to do it to the extent you're going to look at the ARB's opinion with respect to the damages the ALJ awarded, we're saying that we think the ALJ looked at the record a little more closely and understood that Captain Lutter was still under ongoing treatment throughout the entire procedure. Aren't you seeking additional compensation on this appeal? You don't want us to just say, by the way, you made an error and you're finding a fact and not award additional compensation. Correct. I would have to say what the ARB said. But you're challenging the judgment. I'm challenging the judgment. And you didn't file a cross appeal. That's correct. Let me address a couple things that I wanted to talk about with respect to the way that things worked in Miami. Captain Lutter called his dispatcher per Continental's manual and asked for an inspection and explained why. He also wrote up in the logbook that the first officer from the preceding flight reported. You were asking about the violations. One violation would be flying the airplane from Houston to Miami without the severe turbulence inspection. That's where the violation occurred. If LeMaire, in fact, went through severe turbulence and didn't write it up. And if in doubt, frankly, everybody testified in the case he should have. You asked about whether Captain Lutter testified about not wanting to talk in front of the passenger. He was summoned from the airplane cockpit up to a podium in the gate area where all the passengers were waiting. And that's when he got in that first somewhat heated conversation with Commodore. We have evidence in the record, and there was quite a bit of testimony at the hearing, where he talked about he didn't want to talk about the airplane having gone through severe turbulence in front of the passengers that were all standing around with an earshot. So that's something that I wanted to clarify for you all. I think it's also very important to note that the ALJ on page 38 of his original opinion found that Commodore did not talk to Captain LeMaire or First Officer Salisbury even though he told Lutter on the phone that he had talked to them, and they said they didn't go through severe turbulence. We spent quite a bit of time at trial showing a timeline that showed that Commodore couldn't have talked to those two gentlemen until they got to the hotel, which was after Lutter took off, after the airplane had, in fact, been inspected and taken its 37-minute delay. I think that's one of the reasons the ALJ had a lot of trouble with Continental's position in this whole case was because Commodore basically tried to get him to fly the airplane, saying he'd talked to the previous crew when he, in fact, had not. I think that's a very significant issue. Lutter, I guess the other thing was the violation you asked about, I think, Your Honor. You said, what were the violations? And I think the violation would be flying the airplane through severe turbulence and not having inspected and telling Captain Commodore, if you make me fly this airplane, I will report you to the FAA. Had Continental simply just gone ahead and ordered the inspection at the time Lutter called for it and called the dispatcher, I don't even think the flight would have taken a delay and we wouldn't be standing here today. So I hope that clarifies any of the questions, Your Honor. All right. Thank you very much. Okay, Mr. Minnesota, back to you, sir. I think that anyone who hangs up on his boss in a second phone call is absolutely disrespectful to the boss, is summoned by the chief pilot in Houston to a meeting and lies and says he's on vacation, is going to have to expect some kind of discipline. I don't think there's any question about that. What do you say to counsel's argument that the ALJ found that all that was pretext and the real reason was the pilot refusing to agree to go ahead and take off in the airplane? The ALJ didn't make adequate findings of pretext. The question about pretext would be, was the reason he was given the warning letter not because they thought that he deserved some kind of warning, but because he refused to take a flight? That's the pretext question. There is no evidence in the record that these management pilots are going to be mad at somebody for wanting an inspection if there's turbulence. What happened here is they got word of this odd situation and could completely legitimately, based on their knowledge of safety and their experience and their understanding of severe turbulence, could reasonably determine, hey, what is going on here? Let's figure this out. The comments you heard about pressure pack situation and pushing him to take a plane, that wasn't the point. These pilots know you... Let's put it this way. If Captain Lemaire had thought there was severe turbulence between McAllen and Houston and he got to Houston and wrote up severe turbulence, need an inspection, there's no evidence he would have been punished for that. That would be a day in the life of a pilot. That's the normal thing that happens. This was not a normal situation. Again, if in the end Captain Lutter said, you know what, guys, I really think, based on what I have heard, that there should be an inspection, management would have said fine. You know, all of your argument goes to viewing the facts in the record differently. So give us your best fact or facts to show that there was not substantial evidence to support the ARB. Well, that's hard to do because we don't agree with ARB that any of the findings saying that Captain Lutter was reasonable under the circumstances can stand because you cannot be reasonable when you're not listening to people and you're not getting any information. He needs to throw Captain Lemaire under the bus to make out any semblance of a violation, i.e., Captain Lemaire knew there was turbulence and for whatever reason didn't write it up. I can't narrow it down to one fact. I said fact or facts. I know you possibly can't narrow it down to one, but we're looking at a substantial evidence test. I mean, that's the whole point of administrative procedures. And the ALJ heard the testimony of the witnesses. He had judged their credibility, et cetera, et cetera, et cetera. You know, Hornbook law. So why would we find there was not substantial evidence in support of the ruling? Well, first of all, there really weren't that many credibility determinations. There was a section on credibility where the judge said sometimes he credits Lutter and sometimes he doesn't. The issue in the case that we have is the application of these facts to Air 21, the aviation whistleblower statute. The statute does not put the Department of Labor in charge of determining whether management or a pilot was more reasonable or more prudent on an operational issue under Air 21. That is not the Department of Labor's role. We can trust the system that's in place to protect safety, and that requires, as I said at the beginning, coordination and communication and open-mindedness. That is how safety is protected. We don't have a statute that's in place for the Department of Labor to say, well, we look at this flight, we look at this position, we look at these facts, and we decide who's more prudent. That's what the Department of Labor did in this case. The FAA is nowhere to be found in this case. If there were violations, we would expect the FAA to be more concerned about that, right? Well, Congress, in its wisdom, gave the Department of Labor the right to decide these cases. In their wisdom, they gave the Department of Labor the right to decide if, in this case, Captain Jost punished Captain Luder for asking for an inspection. It is no small thing for a Department of Labor to find that Captain Jost would punish somebody for doing that. I mean, he, as the record shows, is an experienced pilot. The Department of Labor gets to determine if there is punishment for reporting a violation. As we said in our brief, that is not what happened here. The Department of Labor, the ALJ, and then the ARB went off on, well, in these circumstances we think Captain Luder was more reasonable and more prudent, and we don't think management was prudent in this situation. That is not what Congress, in its wisdom, asked the Department of Labor to do in this case. Okay. Time's up. Thank you very much. Thank you, Counsel. We have your case.